**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 25 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

BENEDICT A. WOOTEN,

        Plaintiff-Appellant,

v.

DEPARTMENT OF TREASURY,

        Defendant-Appellee.

No. 97-2180
(D.C. No. CIV-95-758-JC)
(D. N.M.)

---

**ORDER AND JUDGMENT** *

---

Before **TACHA** , **LOGAN** , and **LUCERO** , Circuit Judges.

This case involves an appeal from a district court order granting Appellee

Department of the Treasury's motion for judgment as a matter of law on Plaintiff-

Appellant Benedict A. Wooten's complaint pursuant to Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). [1] We affirm.

---

\*     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f) and 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Appellant, a Hispanic, is a pilot for the United States Customs Service (Customs). He began working for Customs in its Albuquerque, New Mexico branch in May 1987. His immediate supervisor was Richard Rustemeyer. Mr. Rustemeyer was in turn supervised by Albert Souza, the Branch Chief.

During the first two years of his employment with Customs, appellant was assigned pilot-in-command duties on light, fixed-wing aircraft. In September 1989, Mr. Rustemeyer informed appellant that he had been scheduled to attend training to become qualified to fly Blackhawk helicopters. Appellant protested, both because he considered the Blackhawks unsafe and because he believed he had reached an understanding with the Customs official who recruited him that he would not have to fly Blackhawks for Customs.

After appellant protested, Mr. Souza called him into his office, and told appellant that he would have to fly Blackhawks. Appellant stated that if it was Mr. Souza's choice, he would go to training. He reiterated, however, that he was very reluctant to fly Blackhawk helicopters.

After his meeting with Mr. Souza, appellant did some thinking about his career. The next day he returned and told Mr. Souza that he would fly Blackhawks after all. Appellant also requested that Mr. Souza consider him for promotion to an open GS-13 position, which would be available to him as pilot-

in-command of a Blackhawk. Mr. Souza responded that appellant's Blackhawk training had been postponed for two months, until February 1990.

Appellant was eventually recommended for promotion to GS-13, in July 1990. Appellant came to believe that his failure to receive immediate training on flying Blackhawks and promotion to the open GS-13 slot were the result of discrimination against him as a Hispanic. He believed that Mr. Souza delayed his training in order to promote a different pilot, Ernest Armstrong, into the open GS-13 position.

On December 21, 1989, appellant wrote a memorandum to Mr. Souza, in which he complained about the delayed training. He also complained that Mr. Rustemeyer had previously discriminated against him by giving him low performance evaluations and by making a racist remark.

Three years later, appellant had a run-in with a different supervisor, Ralph White resulting from appellant's refusal of Mr. White's order to turn over the keys to a government vehicle. Appellant asserts that both used profanity during the incident. As the result of this incident, appellant was suspended for one day, in April 1993, for failing to obey orders and for one day for disrespectful conduct. Mr. White gave appellant a low performance evaluation for the time period of June 1, 1991 through May 31, 1992. Appellant also received a low performance evaluation for the time period June 1, 1992 through May 31, 1993.

After the incident with Mr. White, appellant told Mr. Souza that if he was suspended, he was going to file a discrimination complaint with the EEOC. A few days after appellant told Mr. Souza he was going to file a complaint, appellant was involved in a second incident resulting in disciplinary action. He took off during a scramble in a Citation jet aircraft, using less than the recommended amount of runway. As the result of this incident, Mr. Souza suspended him from his pilot-in-command duties for a period of thirty days.

Appellant filed this complaint in July 1995, alleging that appellee had discriminated against him based on his national origin and race. He further alleged that appellee had retaliated against him after he complained of the discriminatory actions.

At trial, following the close of appellant's case, appellee moved for judgment as a matter of law, see Fed. R. Civ. P. 50(a). In granting the motion, the district court found that appellant had presented "zero evidence" to support his allegations of discrimination and retaliation. Appellant's App. Vol. IV at 910.

We review the district court's grant of appellee's Rule 50(a) motion applying the following standards:

> Judgement as a matter of law is appropriate if during a jury trial a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on the issue. We review de novo a grant or denial of a judgment as a matter of law. We must construe the evidence and inferences most favorably to the nonmoving party.

Corneveaux v. CUNA Mut. Ins. Group, 76 F.3d 1498, 1502 (10th Cir. 1996) (citations and quotations omitted).

In a Title VII case, the plaintiff has the initial burden of presenting a prima facie case of discrimination. See Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1362 (10th Cir. 1997). Once that showing has been made, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its challenged actions. See id. If the employer meets this burden, the employee must show that the employer's stated reason is actually a pretext for discrimination. See id.

1. Delayed training and dilatory promotion claims

Appellant asserts that appellee discriminated against him by delaying his training, so that it could promote a non-Hispanic into the available GS-13 Blackhawk pilot position. This claim is best analyzed as two separate claims: delayed training and dilatory promotion. We consider each in turn.

We have recognized that failure to provide training may be the basis for a claim of discrimination. See Heim v. Utah, 8 F.3d 1541, 1546 (10th Cir. 1993). In order to establish a prima facie case of discriminatory failure to provide training, a plaintiff must show (1) that he is a member of a protected class; (2) that he applied for training offered by his employer; and (3) that despite being qualified, he was rejected for that training; (4) while the employer continued to

offer the training to others of his qualifications.     See id.  Here, appellant claims appellee accepted him for training, but delayed that training until it was too late for him to fill an available position.  Assuming, without deciding, that such a claim is actionable, appellant has failed to establish a prima facie case.

Appellant presented no evidence that appellee made its initial offer of Blackhawk training to him on a different basis than to any other pilot.     [2] He also presented no evidence that Mr. Souza planned to delay his training from the outset.  In fact, the evidence is to the contrary.  Before appellant met with Mr. Souza, Mr. Rustemeyer handed him paperwork which indicated that he would be attending training in December 1989, which is when appellant contends he should have been allowed to go.    See Appellant's App. Vol. III at 624.

Once having rejected Blackhawk training, appellant was no longer on the same footing as others who had accepted it.  He makes no showing that appellee provided immediate Blackhawk training to nonminority employees who, like him, initially refused to go, but who later changed their minds.  His delayed training claim fails as a matter of law.

---

[2]     In appellant's memorandum to Souza of December 21, 1989, he complained that Mr. Rustemeyer did not notify him of the course until five weeks after he notified an unnamed fellow employee.     See Appellant's App. Vol. II at 387. Appellant does not argue that this delay in notification constitutes discrimination, and we find no basis to conclude that it does.

-6-

We turn to the promotion claim. In order to establish a prima facie case of discriminatory failure to promote, appellant had to show (1) that there were promotional opportunities available that were filled by non-Hispanics; (2) that he was qualified for promotion; and (3) that despite his qualifications, he was not promoted. Cf. Sprague , 129 F.3d at 1362 (stating rule in sex discrimination case).

It is not entirely clear from the record who received the promotion which appellant sought. Appellant claims that Mr. Souza wanted to fill the position with a pilot named Ernest Armstrong. See Appellant's App. Vol. III at 624-25.

However, by training, appellant was not qualified for promotion to the position he sought. That position was for a Blackhawk pilot. Appellant's refusal of Blackhawk training resulted in his inability to fill the position. It is clear that he recognized the effect that his refusal of training could have on his promotional opportunities. In the memorandum to Mr. Souza dated December 21, 1989, appellant acknowledged that by not flying Blackhawks, he had " given up a promotion to the GS-13 grade as per agreement with previous supervisors." Id. Vol. II at 386 (emphasis added). Appellant created the conditions which led to his delayed training and promotional opportunities and cannot now complain that these resulted from actionable discrimination.

2. Disparate treatment claim

Appellant complains that he was disciplined more harshly than non-Hispanics, for similar conduct. "[A] plaintiff may establish a *prima facie* case of disparate treatment by showing (1) he is a member of a protected class; (2) he was [disciplined] for violating a work rule; and (3) similarly situated non-minority employees were treated differently." Elmore v. Capstan, Inc. , 58 F.3d 525, 529-30 (10th Cir. 1995). It is undisputed that appellant has met the first two of these three criteria. We must consider whether he met the third criterion by showing that appellee treated non-Hispanics who committed comparable acts of misconduct differently.

"A claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in material respects." Perkins v. Brigham & Women's Hospital , 78 F.3d 747, 751 (1st Cir. 1996). The comparison between disciplinary actions "need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness." Elmore , 58 F.3d at 530 (quotation omitted). The proponent must show, however, that the incidents he is using for comparison do not involve differentiating or mitigating circumstances that would distinguish them from his own conduct. See Perkins , 78 F.3d at 751.

a. Argument with Ralph White

Appellant argues that the incident which resulted in his two-day suspension is comparable to an incident in which Noel Campbell, a non-Hispanic Customs pilot, also argued with Ralph White but was not suspended. Mr. Campbell testified that during a night mission, Mr. White ordered him to go to the back of a Blackhawk helicopter and to perform the duties of a crew chief. Mr. Campbell was not qualified to perform these duties. He engaged in a heated argument with Mr. White, including profanity. Rather than prolong the altercation or comply with an order he considered dangerous, Mr. Campbell requested and received permission from Mr. White to take sick leave.

This incident is not of comparable seriousness to appellant's altercation with Mr. White. Differentiating or mitigating circumstances are present. First, Mr. Campbell testified that he disobeyed White only after Mr. White ordered him to take an action concerning his flight duties that Mr. Campbell believed was unsafe. In his testimony at trial, Mr. Campbell thoroughly explained the safety factors that motivated his disagreement with Mr. White. See Appellant's App. Vol. IV at 884. By contrast, appellant swore at and disobeyed Mr. White in a dispute about the return of a government vehicle, an incident unmitigated by similar concerns about safety on duty.

Second, Mr. Campbell requested to take sick leave in order to extricate himself from the situation. Mr. White granted his request, and the situation was

-9-

resolved. Appellant testified that he could have resolved his situation by obeying Mr. White's order, and filing a grievance later, but that he did not do so. Finally, appellant admitted that he had been in the wrong in his incident with Mr. White. The two incidents are sufficiently different that, as a matter of law, Mr. Campbell's incident with Mr. White cannot be used to show disparate treatment of appellant.

### b. Insufficient runway clearance

Appellant next seeks to compare the incident in which he took off without sufficient runway clearance to two incidents involving Customs pilot Phil D'Alessio. In the first incident, Mr. D'Alessio crashed an airplane by failing to land at the proper touchdown point. Mr. D'Alessio was disciplined as the result of this incident: he received counseling and suspension of his instructor pilot classification. A National Transportation Safety Board report concerning the incident noted that "[a]ccording to the three pilots on board, the entire approach, including airspeed, rate of descent, and approach angle, appeared normal." Appellant's App. Vol. II at 442.

In the incident for which appellant was disciplined, by contrast, he took off with insufficient runway clearance. Appellant's co-pilot specifically asked him whether there was sufficient runway to make the takeoff, and appellant indicated that there was. Appellant admitted at trial that this action violated his training.

-10-

Most significantly, appellant later duplicated the incident to show that he could become airborne from a short runway. Appellant's behavior here is not comparable to D'Alessio's crash, as a matter of law. [3]

More difficult is another incident involving Mr. D'Alessio, in which he made an unscheduled landing of his aircraft after nearly running out of fuel. Joseph Kluk, the safety officer who reviewed this incident, opined that the pilot error in that incident was of similar seriousness to appellant's short runway incident. See id. Vol. IV at 857. He also stated that to his knowledge, Mr. D'Alessio had never been disciplined for the incident. See id. at 843-44.

Mr. Kluk acknowledged that he had not reviewed the report of the audit team assigned to review the incident after he completed his investigation. See id. at 843. Our review of the audit team's report after it conducted its own "management review visit" shows that Mr. D'Alessio was in fact disciplined for

---

[3]     Appellant makes much of the fact that the D'Alessio crash, and a number of other incidents involving pilot error, which were not specifically fleshed out at trial, were rated more severely by Customs's classification scale, than his own misconduct. See Appellant's App. Vol. IV at 821-22. Joseph Kluk, the safety officer who testified at trial, was not aware of discipline being imposed in these other incidents. Appellant failed to show, however, that the rating of an incident on the classification scale was the sole or necessary criterion by which Customs establishes the disciplinary consequences of incidents. Moreover, other than the D'Alessio incidents, details are lacking about these other events.

the low-fuel incident.    See id. Vol. II at 437.  Moreover, Mr. Souza stated he disciplined Mr. D'Alessio by suspending his pilot-in-command privileges.    [4] Appellant has not presented any evidence about the severity of discipline Mr. D'Alessio received after the audit team visit.  He now insists, in contradiction to the record evidence, that Mr. D'Alessio was not disciplined at all.  Given the state of the record, no reasonable jury could conclude that Mr. D'Alessio received no discipline or that appellant was disciplined more severely than Mr. D'Alessio for the same or similar conduct.

Appellant suggests that Mr. Souza stood up for Mr. D'Alessio after the incident, but not for appellant.  The record shows that Mr. Souza disagreed with Mr. Kluk about the seriousness of the D'Alessio incident, and attempted to get Mr. Kluk to back away from filing his report.  Mr. Kluk's report indicates that Mr. Souza believed that Mr. D'Alessio had a good reason for landing with low fuel, that he had plenty of reserve fuel left in the wings of his aircraft, and that the matter was best handled internally.  Appellant does not identify any arguments

---

[4]    On cross-examination, appellant's counsel impeached Mr. Souza with his prior statement that Mr. D'Alessio had not been suspended.    On redirect, however, Mr. Souza indicated that he had refreshed his memory since his deposition, by viewing a document concerning his discipline of Mr. D'Alessio over the incident.    In view of the audit report committee's independent statement that Mr. D'Alessio had been disciplined, and Mr. Souza's explanation for his prior inconsistent statement, no reasonable jury could have determined that Mr. D'Alessio received no suspension for the incident, as appellant contends.

which Mr. Souza should have advanced on his behalf to similarly justify his conduct in the runway incident. Accordingly, he fails to show that Mr. Souza treated him differently in similar circumstances.

Finally, appellant argues that appellee discriminated against him by giving him lower performance evaluations than Messrs. Campbell and D'Alessio. Appellant presented evidence that he received low evaluations for the time period June 1, 1991 through May 31, 1993. As the Campbell incident and the first D'Alessio incident were not comparable to appellant's misconduct, appellant has shown no discrimination in his receipt of lower evaluations during the time period of these incidents. The second D'Alessio incident, involving low fuel, did not even occur until June 1993, <u>after</u> the low evaluations of which appellant complains.

3. Retaliation claim

Appellant next claims that appellee retaliated against him for complaining about discrimination. His argument is phrased in vague terms. Nevertheless, we have given careful consideration to the evidence which might support this claim.

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) he suffered an adverse employment action subsequent to such opposition or participation; and (3)

-13-

there is a casual connection between his protected activity and the adverse employment action. See Cole v. Ruidoso Mun. Sch., 43 F.3d 1373, 1381 (10th Cir. 1994). Retaliatory motive may be inferred if the plaintiff shows a close temporal proximity between the protected activity and the adverse employment action. See Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir.), cert. denied, 518 U.S. 1019 (1996).

Appellant argues that appellee retaliated against him for his December 21, 1989 memorandum to Mr. Souza complaining of discrimination. He notes that "[a]ll discriminatory and retaliatory events complained of were subsequent to that date." Appellant's Reply Br. at 4. The mere existence of subsequent adverse employment actions is not enough to make appellant's prima facie case. He must draw a causal connection between the activity and the adverse action against him.

There is a three-year gap between the time appellant wrote the memorandum and the next adverse employment action, the recommended discipline for his altercation with Mr. White. In the mean time, appellant received "excellent" performance evaluations for 1989 through 1991. Appellant asserts that Mr. White did not give him the negative performance evaluation covering the period June 1, 1991 through May 31, 1992 until July 1993, also over three years after the 1989 memorandum. The temporal gap here is simply too great to infer retaliation based upon appellant's memorandum of December 1989.

See Candelaria v. EG & G Energy Measurements, Inc., 33 F.3d 1259, 1261-62 (10th Cir. 1994) (collecting cases).

Appellant does show close temporal proximity between the filing of his discrimination charge concerning the two-day suspension and his receipt of the thirty-day suspension of his pilot-in-command duties. We believe he has made his prima facie case of retaliation concerning this incident. In response, appellee states it suspended him because he engaged in unsafe flying. Appellee having asserted a legitimate, nondiscriminatory reason for the suspension, the burden shifts back to appellant to show that this reason was a pretext for retaliatory action. See Love v. Re/Max of Am., Inc., 738 F.2d 383, 385 (10th Cir. 1984).

In an attempt to show that the reason given for the suspension is pretextual, appellant presents two incidents which he says show evidence of discriminatory or retaliatory intent. In the first incident, Mr. Rustemeyer asked appellant if his ponytail was a "Mexican" or "Hispanic" haircut. This incident occurred in 1989, before appellant even presented his memorandum to Souza. Moreover, Mr. Rustemeyer was no longer appellant's supervisor at the time Mr. Souza suspended appellant. This incident is too remote from the disciplinary action to show pretext.

In the second incident, after appellant complained of discrimination, a coworker approached him and made a racist remark. The coworker's comment,

which also occurred years before the disciplinary actions of which appellant complains, is also insufficient to carry appellant's burden of showing pretext.

It is true, as appellant notes, that his supervisors failed to show that they took any remedial action after he reported these incidents. While the comments, and his supervisors' purported inaction to them, might be highly relevant to a hostile work environment claim, they are insufficient to establish that the reasons given for personnel actions taken years later were a pretext for retaliation.

4. Failure to postpone trial

Finally, appellant contends that the district court erred in refusing to grant a motion for continuance of the trial so that he could subpoena a witness to lay a foundation for admitting a newly-discovered exhibit. The exhibit concerns a 1986 helicopter crash. Appellant fails to show that admission of the exhibit would have caused a different result in this case. Any failure to grant a continuance on the basis of this exhibit was at best harmless error.

The judgment is AFFIRMED.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge


-16-